**NOT FOR PUBLICATION** [6]

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____

LINDA GOLDSTEIN,                             :

    Plaintiff,                              :        Civil Action No. 10-4644 (FLW)

    v.                                       :

                                                     **OPINION**

                                             :

BRIAN J. BERKOWITZ, et al.                   :

    Defendants.                              :
_____

**WOLFSON, United States District Judge:**

    Presently before the Court is a motion by Defendants Brian Berkowitz ("Berkowitz") and the Insurance Design Group (collectively referred to as "Defendants") to Dismiss Plaintiff Linda Goldstein's ("Mrs. Goldstein" or "Plaintiff") Complaint for Lack of Personal Jurisdiction or, in the alternative, to transfer the Complaint to the Southern District of Florida.  The above-captioned action arises out of the sale of a portion of a life insurance policy to a life settlement company.  In this motion, Defendants allege that there are insufficient contacts with New Jersey to support this Court's exercise of specific jurisdiction.[1]  The Court held an evidentiary hearing in

---

[1]Although Defendants additionally moved on the grounds that they did not have continuous and systematic contacts with New Jersey to support general jurisdiction, Plaintiff concedes that this Court does not have general jurisdiction over Defendants and argues only that minimum contacts exist to support this Court's exercise of specific jurisdiction.  Transcript of Evidentiary Hearing (February 16, 2011("Tr.") 124:11-16.

1

this matter on February 16, 2011. For the reasons that follow, the Court finds that it does not have personal jurisdiction over Defendants, and, in lieu of dismissal, the Court will transfer this case to the Southern District of Florida.

**I. BACKGROUND**

In or around April 2003, Jerrold Goldstein ("Dr. Goldstein"), Plaintiff's deceased husband, purchased a $5 million life insurance policy from Transamerica naming Plaintiff as the beneficiary. Goldstein Decl. ¶ 5. Defendant Berkowitz, a Florida life insurance agent, was the agent who procured the Transamerica policy for Dr. Goldstein. Id. At the time that Dr. Goldstein initially approached Berkowitz[2], the Goldsteins maintained residences both in New Jersey and in Florida. Berkowitz Decl. ¶ 3. Indeed, on the insurance application, Dr. Goldstein identified his address as Highland Beach, Florida, but requested that premium notices be sent to the Goldsteins' home in Warren, New Jersey. Id. Additionally, Dr. Goldstein maintained two medical practices in Florida and one in New Jersey. Def's Ex. 1. Furthermore, all the in-person meetings between Dr. Goldstein and Berkowitz occurred in Florida.[3] Tr. 52:18-53:14, 55:21-56:5.

As discussed above, Berkowitz, a Florida resident, was the life insurance agent who procured the Transamerica policy for Dr. Goldstein. At all times, Berkowitz has only been licensed to sell life insurance in Florida; Berkowitz has never been licensed to sell life insurance in New Jersey

---

[2]Dr. Goldstein was referred to Berkowitz by Ted Taddei ("Taddei"), another Florida life insurance agent. Tr. 53-54.

[3]The Court notes that Mrs. Goldstein did not meet Berkowitz in person until the February 16, 2011 hearing in this matter.

and has never held a license as a life settlement broker. Tr. 47:15- 48:9.[4] Further, Berkowitz has never maintained an office in New Jersey, never advertised in New Jersey, has no employees or agents in New Jersey, does not own property in New Jersey and has no bank accounts in New Jersey. Id. at 49-51.

In 2004 and 2005, the Goldsteins began to experience financial difficulties and reached out to Berkowitz to inquire about their options with respect to Dr. Goldstein's life insurance policy. Goldstein Decl. ¶ 8; Berkowitz Decl. ¶ 9; Tr. 106:19-22. Specifically, the Goldsteins learned that in addition to reducing the amount of the policy, they might also be able to sell a portion of Dr. Goldstein's policy. Id.; Tr. 65:19-23, 102:1-7. Eventually, the Goldsteins decided to sell a portion of Dr. Goldstein's life insurance policy and, because Berkowitz was not a life settlement broker, he referred the Goldsteins to the Ashar Group, LLC ("Ashar"), a life settlement broker located in central Florida with a license to do business in New Jersey. Goldstein Decl. ¶ 8; Berkowitz Supp. Decl. ¶ 11. Subsequently, Ashar brokered a life settlement contract between Plaintiff and First Global Trust, LLC ("First Global"), a New Jersey entity, pursuant to which First Global purchased $4,000,000 of the life insurance policy for a one time $50,000 payment to Plaintiff. Goldstein Decl. ¶ 10. Unbeknownst to Plaintiff, Berkowitz received a $10,000 referral fee from Ashar which he split with Taddei. Berkowitz Supp. Decl. ¶ 17; Tr. 72:10-11.

In early January 2006, to effectuate the life settlement transaction, ownership of Dr. Goldstein's policy was transferred from Dr. Goldstein to Plaintiff. Berkowitz Decl. ¶ 10. On or

---

[4] A life insurance broker is an agent licensed to sell life insurance; conversely, a life settlement broker is licensed to conduct negotiations between a party looking to sell a life insurance policy and an entity interested in purchasing that life insurance policy.

3

around January 23, 2006, Plaintiff executed a copy of the life settlement contract and returned it to Ashar Group via Federal Express.[5]  Goldstein Decl., Ex. C; Tr. 115-116.  Mrs. Goldstein avers that Berkowitz had a copy of the life settlement contract as early as January 23, 2006, Tr. 117:6-7, and alleges that Berkowitz "read the entire . . . contract to me over the telephone and explained some of the provisions I had questions about."  Goldstein Decl. ¶ 11.  Berkowitz specifically controverts these allegations.  Indeed, Berkowitz testified that although he discussed the life settlement contract with Mrs. Goldstein on or around January 23, 2006, he did not have a copy of the contract.  Tr. 80-81.  Instead, Berkowitz avers that he received a phone call from Mrs. Goldstein "telling me that there was some mistakes in the contract. . .[s]o at that time I subsequently contacted the Ashar Group to let them know that there was a mistake in the contract; and due to the time constraints that were involved, he informed me to go ahead and let Mrs. Goldstein know to please go ahead and just make the corrections on the contract itself."  Tr. 81.

Thereafter, on February 6, 2006, Berkowitz notified Mrs. Goldstein that Ashar had transferred the ownership of $4 million of the life insurance policy to First Global and that she

---

[5] The Court notes that although Plaintiff testified that she was "99 percent sure" she returned the life settlement contract to Berkowitz and not Ashar, in the absence of a copy of the FedEx receipt, the Court found that because Ashar sent Plaintiff the contract and included a prepaid Fed Ex envelope, "a reasonable inference would be the return envelope, as [Mrs. Goldstein] indicated, a FedEx return envelope would have been to go back to Ashar."  Tr. 116:12-14.  Indeed, the Court explained that it was accepting Mrs. Goldstein's "testimony [that] Ashar sent [the life settlement contract] to you with a return FedEx envelope. I think it's unlikely they would send a FedEx envelope to Mr. Berkowitz since he could not write the policy..."  Tr. 116-117.  Moreover, the Court noted that it would be highly unlikely for Ashar to send Plaintiff the life settlement contract and include a prepaid FedEx envelope to send the contract to Berkowitz as opposed to Ashar "because all it would mean is if it went to Berkowitz, he would have to forward it to [Ashar] anyway."  Tr. 116.

would be receiving the $50,000 payment from First Global.  Tr. 73:20-25; Goldstein Decl. ¶ 16.
At that time, Berkowitz asked Mrs. Goldstein to call him immediately about the remaining $1
million Transamerica policy because he wanted to ensure that the Goldsteins paid the outstanding
premium on the $1 million policy to prevent the policy from lapsing.  Tr. 74:1-17; Goldstein
Decl. ¶¶ 16-18.

On February 10, 2006, Dr. Goldstein committed suicide.  On February 14, 2006, Mrs.
Goldstein phoned Berkowitz to inform him of Dr. Goldstein's death.  Tr. 74-75; Goldstein Decl. ¶
22.  During the call on February 14, 2006, Berkowitz informed Mrs. Goldstein that he was gong
to contact Ashar "because in my mind I was thinking there should be some recourse because he
passed away within the rescission period."  Tr. ¶ 75:3-6.  Importantly, however, as of February
14, 2006, Berkowitz testified that he did not have and had not seen a copy of the executed life
settlement contract and, therefore, did not know what the rescission period was.  Tr. 75.
Specifically, Berkowitz explained that he "wasn't involved in [Mrs. Goldstein's] life settlement
transaction.  I was involved with her as the Goldsteins' life insurance agent in helping them
navigate through what needed to be done with respect to their insurance policy. I was not on the
end of the life settlement transaction."  Tr. 75: 16-21.  Following the call with Mrs. Goldstein,
Berkowitz "contacted Ashar in an attempt to have him [sic] contact the funder and let them know
that he had passed away."  Tr. 75:6-8.  Thereafter, on or around February 16, 2006, Berkowitz
obtained a copy of the life settlement contract from the Ashar Group.  Tr. 80:12-15.

On or around August 2, 2010, Plaintiff filed a suit against Defendants in the Superior Court
of New Jersey, Law Division, Somerset County.  Defendants removed this action on September
10, 2010 and, on September 29, 2010, filed the instant motion to dismiss alleging that there are

5

insufficient contacts with New Jersey to support this Court's exercise of jurisdiction over them. The Court held an evidentiary hearing and oral argument on February 16, 2011.

## II. STANDARD OF REVIEW

The instant motion challenges this Court's jurisdiction over Berkowitz and the Insurance Design Group. Pursuant to Fed. R. Civ. P. 4(e), a district court may exercise jurisdiction over a non-resident defendant to the extent permitted by the law of the state where the district court sits. See Fed.R.Civ.P. 4(e). "A federal court sitting in New Jersey has jurisdiction over parties to the extent provided under New Jersey state law." Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 96 (3d Cir.2004). "A court may exercise jurisdiction over a defendant if the defendant has specific or general contacts with the forum." Horton v. Martin, No. 04-4684, 2005 U.S. App. LEXIS 859, at *3-4 (3d Cir. June 15, 2005). "New Jersey's long-arm statute provides for jurisdiction coextensive with the due process requirements of the United States Constitution." Miller, 384 F.3d at 96 (citing N.J. Ct. R. 4:4-4(c)). "The due process clause of the [F]ourteenth [A]mendment of the United States Constitution limits the reach of long-arm statutes so that a court may not assert personal jurisdiction over a nonresident defendant who does not have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Provident Nat'l Bank v. California Federal Sav. & Loan Asso., 819 F.2d 434, 437 (3d Cir.1987).

Pursuant to Fed.R.Civ.P. 12(b)(2), a plaintiff must demonstrate by a preponderance of the evidence facts sufficient to support the assertion of personal jurisdiction over a defendant. Ameripay, LLC v. Ameripay Payroll, Ltd., 334 F. Supp.2d 629, 632 (D.N.J.2004) (citing Carteret

Savings Bank, FA v. Shushan, 954 F.2d 141, 146 (3d Cir.1992)).  Although "[a] court must accept as true the allegations in the complaint and resolve disputed issues of fact in favor of the plaintiff[,]" for purposes of jurisdiction, plaintiff cannot rely on pleadings alone, but instead must provide actual proofs.  Id. (citing Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 66 n. 9 (3d 1984)).  Typically, when a court does not hold an evidentiary hearing on a motion to dismiss, a plaintiff "need only establish a prima facie case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor."  Miller, 384 F.3d at 97; see also Carteret Sav. Bank, 954 F.2d at142 n. 1.  However, when, as here, a court holds an evidentiary hearing and hears the testimony of witnesses, it logically follows that the court may assess a plaintiff's allegations in light of the testimony and evidence in the record for the purpose of determining the Court's jurisdiction.  Cf. Miller, 384 F.3d at 97.  "Once the plaintiff has shown minimum contacts, the burden shifts to the defendant, who must show that the assertion of jurisdiction would be unreasonable."  Id. (citing Mellon Bank (East) PFSF, Nat'l Assoc. v. Farino, 960 F.2d 1217, 1221 (3d Cir.1992)).

**III. DISCUSSION**

A. Personal Jurisdiction

In determining whether these due process considerations permit the exercise of personal jurisdiction, the Third Circuit has distinguished between general jurisdiction – where a defendant's contacts with the forum are "continuous and systematic" regardless of whether the defendant's forum-related activities give rise to the underlying cause of action, see, e.g.,

Provident Nat'l Bank, 819 F.2d 434 – and specific jurisdiction, i.e., "cases where the claim arises out of a specific forum-related act or series of acts." Paolino v. Channel Home Centers, 668 F.2d 721, 724 (3d Cir. 1981).   As discussed above, because Plaintiff concedes that there are insufficient contacts between Defendants and this forum to establish general jurisdiction,  the sole issue for this Court is whether Plaintiff can establish specific jurisdiction.

"Specific jurisdiction" is established "where the plaintiff's cause of action is related to or arises out of the defendant's contacts with the forum [and] the defendant has constitutionally sufficient 'minimum contacts' with the forum." Pinker v. Roche Holdings Ltd., 292 F.3d 361 (3d. Cir.2002).  In order to establish "minimum contacts," defendant must have performed, at least, a deliberate act with the forum state relating to the cause of action.  Smith v. S & S Engineering Works, Ltd., 139 F. Supp.2d 610 (D.N.J.2001) (citing United States Golf Ass'n v. United States Amateur Golf Ass'n, 690 F. Supp. 317, 320 (D.N.J.1988)).  The inquiry into defendant's "minimum contacts" with a particular forum is meant to determine whether defendant "reasonably anticipate[d] being haled into court there." World Wide Volkswagen Corporation v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) (citations omitted).

Courts undertake a three-part inquiry in assessing whether there is specific jurisdiction. D'Jamoos v. Pilatus Aircraft Ltd., 566 F.3d at 102.  First, the defendant must have "purposefully direct[ed] [its] activities" at the forum. Burger King, 471 U.S. at 472 (internal quotation marks omitted).  The "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated contacts." Id. at 474. Second, the litigation must "arise out of or relate to" at least one of those activities. Helicopteros

v. Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 (1984); O'Connor v. Sandy Lane Hotel Co., Ltd., 496 F.3d 312, 317 (3d Cir. 2007).  And third, if the first two requirements have been met, a court may consider whether the exercise of jurisdiction otherwise "comport[s] with 'fair play and substantial justice.'"  Burger King, 471 U.S. at 476 (quoting International Shoe v. Washington, 326 U.S. 310, 320 (1945)).

   The first two parts of the test determine whether a defendant has the requisite minimum contacts with the forum.  The threshold requirement is that the defendant must have "purposefully avail[ed] itself of the privilege of conducting activities within the forum State."  Hanson v. Denckla, 357 U.S. at 253.  To meet this requirement, the defendant's physical entrance into the forum is not necessary.  See Burger King, 471 U.S. at 476; Grand Entm't Group, Ltd. v. Star Media Sales, Inc., 988 F.2d 476, 482 (3d Cir.1993).  A defendant's contacts, however, must amount to a deliberate targeting of the forum."  O'Connor, 496 F.3d at 317.  The "unilateral activity of those who claim some relationship with a nonresident defendant" is insufficient.  Hanson, 357 U.S. at 253.


i. Minimum Contacts

   At the outset, the Court notes certain facts that are not in dispute concerning Defendants' contacts with New Jersey; as discussed above, Berkowitz never traveled to New Jersey, did not solicit business in New Jersey, was not licensed to sell life insurance in New Jersey and has never maintained an office nor advertised in New Jersey.  Tr. 49-51.  Moreover, all the contacts between Berkowitz and the Goldsteins were either in-person meetings in Florida between Dr.

Goldstein and Berkowitz at the time the policy was purchased or contacts with Dr. Goldstein and/or Mrs. Goldstein by telephone and mail.

Despite these limited contacts, Plaintiff contends that Defendants had sufficient contacts with New Jersey to support this Court's exercise of jurisdiction over them.  Specifically, Plaintiff contends that Berkowitz sold the Transamerica policy to Dr. Goldstein, a New Jersey resident, in 2003 and that Dr. Goldstein sent checks from a New Jersey residence directly to Berkowitz in Florida who forwarded them to Transamerica.  Moreover, Plaintiff alleges that "Berkowitz voluntarily became the integral part of structuring the Life Settlement between Plaintiff and the Ashar Group in 2005," events which occurred after the Goldsteins sold their Florida home.  Pl's Opp. Br. at 10.  In addition, Plaintiff alleges that all communications between the Goldsteins and Ashar were through Berkowitz and that Berkowitz was the Goldsteins' primary contact throughout the life settlement process.  Id.  In support of this allegation, for example, Plaintiff testified that Berkowitz read the life settlement contract to her over the phone while she was in New Jersey prior to her execution of the contract.  Tr.  27:16 - 28: 2.  Finally, Plaintiff contends that the advice Berkowitz provided to her regarding the rescission of the life settlement contract (and allegedly failed to provide to Plaintiff) was given to Plaintiff in New Jersey and that all the witnesses for the case are in New Jersey.  Pl's Opp. Br. at 10.

Initially, the Court notes that the bare existence of a professional-client relationship, even when the client alleges negligence by the professional, does not support specific jurisdiction without further contact.  See Trinity Indus., Inc. v. Myers & Assocs., Ltd., 41 F.3d 229, 230-31 (5th Cir.1995) (noting that existence of attorney-client relationship not enough to establish personal jurisdiction); FDIC v. Malmo, 939 F.2d 535, 536-37 (8th Cir.1991) (effects of attorney's

10

negligence inside forum not sufficient to establish personal jurisdiction); Henshell Corp. v. Childerston, Civ. A. No. 99-2972, 1999 WL 549027, at *4 & n. 2 (E.D.Pa. July 28, 1999) (listing cases in which minimum contacts not found on basis of attorney-client communications and/or malpractice).

Moreover, the Court finds that many of the alleged contacts that Berkowitz had with New Jersey arose out of the sale of the original Transamerica policy to Dr. Goldstein, the sale of which occurred in Florida. However, the instant matter does not directly arise out of or relate to the Transamerica policy; instead, this matter relates to Berkowitz's alleged failure to advise Plaintiff to rescind the life settlement contract, a contract for which he was neither the broker nor the insurer. See, e.g., Kubin v. Orange Lake Country Club, Inc., No. Civ. A. 10-1643, 2010 WL 3981908, at *4 (D.N.J. Oct 08, 2010) (explaining that because phone calls made into the forum were unrelated to the injury alleged, they were not contacts related to the transaction at issue); Deflora Lake Development Associates, Inc. v. Hyde Park Ltd. Partnership, No Civ. A. 07-0899, 2007 WL 3125233, at *3 (D.N.J. Oct 24, 2007) (holding that plaintiff had failed to establish minimum contacts based on visits to New Jersey for the purpose of entering into a contract when the lawsuit was based on a later amendment to the contract and not the original contract); Starline Optical Corp. v. Caldwell, 598 F. Supp. 1023, 1026 (D.N.J. 1984); Western Union Telegraph Co. V. T.S.I., Ltd., 545 F. Supp. 329, 334 n.7 (D.N.J. 1982)("there must be contacts between the transaction at issue and the forum state, as opposed to contacts between the defendant and the forum state. . . to warrant the forum's assertion of jurisdiction over the controversy."). Thus, for purposes of determining whether there are sufficient contacts to exercise jurisdiction over Berkowitz regarding the life settlement contract, the contacts that are most significant to this

Court are those that Defendant had with relation to the life settlement contract and not those that related to the purchase of the Transamerica policy. Therefore, the following contacts are most relevant to this Court's inquiry: (1) Defendant's referral of Ashar to Plaintiff as a possible life settlement broker; (2) Defendant's receipt of a referral fee from Ashar; and (3) Defendant's review of the life settlement contract with Plaintiff. For the reasons that follow, the Court finds that these contacts and the communications with Mrs. Goldstein concerning the life settlement contract are neither sufficient singly, nor in the aggregate, to justify an exercise of personal jurisdiction over Defendants.

First, Berkowitz's referral of the Ashar group, a Florida entity, as a possible life settlement broker to a New Jersey resident – and Berkowitz's receipt of a referral fee from Ashar – are not sufficient contacts for this Court to assert specific jurisdiction over Berkowitz in New Jersey. The Court finds that Berkowitz's referral of the Ashar group occurred as a result of the Goldstein's unilateral interest in selling a portion of Dr. Goldstein's life insurance policy. See, e.g. Hanson, 357 U.S. at 253 ("The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State."). Indeed, the record demonstrates that in 2004 and 2005, the Goldsteins began to experience financial difficulties and, as a result, reached out to Berkowitz to inquire about their options regarding Dr. Goldstein's life insurance policy. As a result of this inquiry, the Goldsteins learned that they could sell a portion of their life insurance policy and Berkowitz referred them to the Ashar group as a possible life settlement broker. Goldstein Decl. ¶ 8; Tr. 105-107. The record is clear that Berkowitz was not paid by the Goldsteins for this referral and that the only payment Berkowitz received as a result of this referral was a fee from the Ashar group, a Florida entity, to

Berkowitz in Florida. Berkowitz did not solicit business for Ashar and had no role in deciding what entity would eventually purchase Plaintiff's life insurance policy. Tr. 66-68. Further, as discussed above, Berkowitz is not a licensed life settlement broker and could not have brokered the life settlement contract for the Goldsteins. Tr. 48. Instead, Berkowitz was merely acting in his role as a life insurance agent by servicing the life insurance policy and facilitating the Goldsteins' ability to dispose of a portion of the policy.

Moreover, although Plaintiff contends that Berkowitz provided advice regarding the life settlement contract in New Jersey including that he "read the entire . . .contract to me over the telephone [in New Jersey] and explained some of the provisions I had questions about" on January 23, 2006, i.e., prior to Dr. Goldstein's death, Goldstein Decl. ¶ 11, there is insufficient evidence in the record to demonstrate that Berkowitz had seen the contract prior to February 16, 2006, nearly six days after Dr. Goldstein's death. Instead, the evidence in the record demonstrates that while Mrs. Goldstein phoned Berkowitz in Florida on January 23, 2006, the substance of the conversation was Mrs. Goldstein telling Berkowitz "that there was [sic] some mistakes in the contract. . .[s]o at that time I subsequently contacted the Ashar Group [in Florida] to let them know that there was a mistake in the contract; and due to the time constraints that were involved, he informed me to go ahead and let Mrs. Goldstein know to please go ahead and just make the corrections on the contract itself." Tr. 81. Thus, while both Plaintiff and Berkowitz testified that they discussed the contract on January 23, 2006, Tr. 21-22; 80-81, the Court finds that on this record, Plaintiff has not demonstrated that Berkowitz gave her advice in New Jersey concerning the life settlement contract nor that had he seen a copy of the contract on January 23, 2006 or at any time prior to its execution.

13

Plaintiff additionally alleges that she phoned Berkowitz from New Jersey on February 14, 2006 to inform him of Dr. Goldstein's death and that Berkowitz failed to advise her to rescind the life settlement contract on February 14, 2006, the final day of the rescission period. Goldstein Decl. ¶¶ 22,23,25.  As discussed above, however, it is not at all clear that Berkowitz had seen a copy of the contract as of February 14, 2006, nor that he knew what the rescission period was nor when it would expire.  Indeed, at the hearing, Berkowitz averred that at the time of their phone call on February 14, 2006, he did not have a copy of the life settlement contract and, therefore, did not know the dates within which Plaintiff could timely rescind the policy.  Tr. 75.  Specifically, Berkowitz explained that he "wasn't involved in [Mrs. Goldstein's] life settlement transaction.  I was involved with her as the Goldsteins' life insurance agent in helping them navigate through what needed to be done with respect to their insurance policy. I was not on the end of the life settlement transaction." Tr. 75: 16-21.  However, the Court notes that what Berkowitz knew at the time of the call is not dispositive in the personal jurisdiction analysis; rather, the significant facts are that Mrs. Goldstein placed a call to Berkowitz <u>in Florida</u> and that a discussion ensued.  Following the call with Mrs. Goldstein, Berkowitz "contacted Ashar [in Florida] in an attempt to have him [sic] contact the funder and let them know that [Dr. Goldstein] had passed away." Tr. 75:6-8.  According to Berkowitz, after the phone call, on or around February 16, 2006, he obtained a copy of the life settlement contract from the Ashar Group.  Tr. 80:12-15.   Ultimately, Plaintiff's calls to Berkowitz in Florida, her questions regarding mistakes in the life settlement contract for which Berkowitz was not the broker nor the insurer, and Berkowitz's passing of a message regarding Dr. Goldstein's death to Ashar in Florida do not suffice to establish Defendant's minimum contacts with New Jersey.  <u>See, e.g.</u>, <u>Mellon Bank</u>

(East) PSFS, N.A. v. DiVeronica Bros., Inc., 983 F.2d 551, 555-556 (3d Cir. 1993); Reliance Steel Products Co. v. Watson, Ess, Marshall & Enggas, 675 F.2d 587, 589 (3d Cir. 1982).  Thus, the Court finds that there is not specific jurisdiction over Berkowitz and the Insurance Design Group. [6]

ii. Calder Effects Test[7]

In addition, the Court may exercise personal jurisdiction over a nonresident defendant who commits an intentional tort outside the forum pursuant to the test set forth by the Supreme Court in Calder v. Jones, 465 U.S. 783 (1984).  The Third Circuit applied Calder in IMO Indus. Inc. v. Kiekert, 155 F.3d 254 (3d Cir.1998), where it held that the effects test requires the plaintiff to show that: (1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of the tort; [and] (3) the defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity.  Id. at 265-66.

Initially, the Court notes that it is unclear whether Plaintiff has even alleged an intentional tort that would require this Court's analysis under Calder.  Indeed, the bulk of Plaintiff's

---

[6]Because the Court has determined that minimum contacts with New Jersey do not exist, the Court need not consider whether the exercise of jurisdiction comports with "traditional notions of fair play and substantial justice.  See Int'l Shoe, 326 U.S. at 316.

[7]While the parties did not address the Calder effects test in their initial papers, the Court raised this issue at oral argument and gave the parties the opportunity to submit supplemental briefing on this issue.

Complaint sounds in negligence, and although Count IV alleges a cause of action under the New Jersey Consumer Fraud Act ("NJCFA") based on allegations that Defendant "did conceal, omit or suppress information from Plaintiff," Compl. ¶ 28, it is unclear whether Count IV actually asserts an intentional tort.  See Arcand v. Brother Intern. Corp., 673 F. Supp. 2d 282, 296-97 (D.N.J. 2009) (explaining that under the NJCFA, "allegations of an affirmative act, i.e. a misrepresentation, do not require a showing of intent or even actual deceit or fraud."). However, to the extent that Plaintiff's Complaint can be read to include a claim for an intentional tort under the NJCFA, the Court finds that Plaintiff has failed to establish jurisdiction pursuant to the Calder effects test.

The Calder effects test and traditional specific jurisdiction analysis are different, but they are cut from the same cloth. Just as the standard test prevents a defendant from "be[ing] haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts," Burger King, 471 U.S. at 475 (citations and quotation marks omitted), the effects test prevents a defendant from being haled into a jurisdiction solely because the defendant intentionally caused harm that was felt in the forum state if the defendant did not expressly aim his conduct at that state. See, e.g., Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 455 n. 6 (3d Cir.2003) (indicating the effects test is an alternative to "minimum contacts" analysis but declaring they both require a similar type of "intentionality" on the part of the defendant).  Importantly,  the Third Circuit has held that the Calder test "should be applied narrowly," and that, "[a]t a minimum, [plaintiff] must allege facts that establish that defendants 'expressly aimed' their conduct at" the forum in question." Marks v. Alfa Group, 369 Fed.Appx. 368, 370 (3d Cir. 2010).  To establish that the defendant "expressly aimed" his conduct, the plaintiff has to demonstrate "the defendant knew

that the plaintiff would suffer the brunt of the harm caused by the tortious conduct in the forum, and point to specific activity indicating that the defendant expressly aimed its tortious conduct at the forum." IMO Indus., 155 F.3d at 266.  To demonstrate that a defendant expressly targeted a forum with its tortious activities, a plaintiff typically must show that the defendant made "some type of 'entry' into the forum state." IMO, 155 F.3d at 265 (citing Indianapolis Colts, Inc. v. Metro. Baltimore Football Club, 34 F.3d 410, 412 (7th Cir.1994)).  If a plaintiff fails to show that the defendant " 'manifest[ed] behavior intentionally targeted at and focused on' the forum," IMO Indus., 155 F.3d at 265 (quoting ESAB Group Inc. v. Centricut, Inc., 126 F.3d 617, 625 (4th Cir.1997)), the plaintiff fails to establish jurisdiction under the effects test.

Here, Plaintiff's sole allegation that Berkowitz expressly aimed his allegedly tortious conduct at the forum is Berkowitz's knowledge that Plaintiff lived in New Jersey and that when they discussed the life settlement contract, Berkowitz knew he was speaking to Plaintiff in New Jersey.  Plaintiff's Supp. Br. at 1.  However, the mere fact that a defendant knew that the plaintiff resided in a particular forum "is insufficient to establish jurisdiction, even with an intentional tort." Marks, 369 Fed. Appx. at 370 (citing Marten, 499 F.3d at 299).  As discussed above, Berkowitz did not negotiate or broker the life settlement contract; indeed, Berkowitz's only actions with respect to the life settlement contract were to refer the Goldsteins to Ashar, a life settlement broker in Florida, and to continue to service the remaining portion of Dr. Goldstein's life insurance policy.  Plaintiff has "failed to allege any specific facts showing a deliberate targeting of" New Jersey, Marten, 499 F.3d at 298, and has not alleged any facts to demonstrate that Berkowitz made "some type of 'entry' into" New Jersey.  IMO, 155 F.3d at 265. It is Plaintiff's burden to establish the existence of jurisdiction when challenged with a motion to

17

dismiss for lack of jurisdiction, and Mrs. Goldstein has not met that burden here.

B. Transfer

Alternatively, Defendant requests that this Court transfer this action to the United States District Court for the Southern District of Florida. Pursuant to 28 U.S.C. §§ 1404(a) and 1406(a), the Court will permit the transfer of this case to the District Court in Florida in the interests of justice. See 28 U.S.C. § 1404(a). Furthermore, because Plaintiff brought this case in the incorrect forum, it is appropriate for the Court to transfer it to the forum where it could have originally been brought. See 28 U.S.C. § 1406(a); see also Gehling, 773 F.2d at 544 (District Court's finding that it did not have jurisdiction over the defendant does not prevent the case from being transferred to the forum where it could have originally been brought).

IV. CONCLUSION

For the foregoing reasons, Defendants' motion is GRANTED in part and DENIED in part; specifically, this Court finds that it does not have personal jurisdiction over the Defendants, and, in lieu of dismissal, the Court will transfer this case to the Southern District of Florida.

Dated: March 18, 2011                                /s/ Freda L. Wolfson
                                                     Freda L. Wolfson, U.S.D.J.